```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3                                  )
    UNITED STATES OF AMERICA,       )  CR 10-00576 SOM
 4                                  )
             Plaintiff,             )  Honolulu, Hawaii
 5        vs.                       )  November 1, 2010
                                    )  3:00 P.M.
 6  (01) MORDECHAI YOSEF ORIAN,     )
    also known as Motty,            )  Appeal to the District Judge
 7  (02) PRANEE TUBCHUMPOL,         )  of the Magistrate Judge's
    also known as Som,              )  Bench Ruling Modifying
 8                                  )  Defendants' Release
             Defendants.           )  Conditions
 9                                  )
    _____)

10

11                TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE SUSAN OKI MOLLWAY
12              UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  For the Government:          THOMAS J. BRADY
                                 Office of the U.S. Attorney
15                               PJKK Federal Bldg.
                                 300 Ala Moana Blvd. Ste. 6100
16                               Honolulu, HI 96850

17                               SUSAN FRENCH
                                 U.S. Dept. of Justice
18                               601 D St NW
                                 Washington, D.C. 20004
19
    For the Defendant            LYNN E. PANAGAKOS
20  Mordechai Yosef Orian:       Davies Pacific Center
                                 841 Bishop St., Ste. 2201
21                               Honolulu, HI 96813

22                               MARK J. WERKSMAN
                                 888 West Sixth Street
23                               Los Angeles, CA 90017

24  For the Defendant            CLARENCE McCURDY VIRTUE
    Pranee Tubchumpol:           1931 E. Vineyard St., Ste. 201
25                               Wailuku, HI 96793
```

```
1    APPEARANCES (Continued):

2    Also Present:              ANTHONY L. BARRY
                                JULIE A. WALL
3                               U.S. Pretrial Services
                                PJKK Federal Bldg.
4                               300 Ala Moana Blvd. Ste. 7222
                                Honolulu, HI 96813
5
     Official Court Reporter:   Debra Kekuna Chun, RPR, CRR
6                               United States District Court
                                300 Ala Moana Blvd. Ste. C285
7                               Honolulu, HI 96850
                                (808) 534-0667
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).
```

```
 1   MONDAY, NOVEMBER 1, 2010              3:00 O'CLOCK P.M.
 2            THE CLERK:  Criminal 10-576SOM, United States of
 3   America versus, defendant 1, Mordechai Orian; and, defendant 2,
 4   Pranee Tubchumpol.  This case has been called for Appeal to the
 5   District Judge of the Magistrate Judge's Bench Ruling Modifying
 6   Defendant's Release Conditions.
 7            Counsel, please make your appearances for the record.
 8            MR. BRADY:  Good afternoon.  Assistant United States
 9   Attorney Tom Brady on behalf of the United States, along with
10   Special Agent Gary Brown from FBI.
11            THE COURT:  Okay.  I think you have some colleagues
12   on the phone; right?
13            MR. BRADY:  We do, Your Honor.  We have Miss Susan
14   French on the phone.
15            THE COURT:  Miss French, are you there?
16            MS. FRENCH:  I am here.
17            THE COURT:  Hi.
18            MS. PANAGAKOS:  Good afternoon, Your Honor.  Lynn
19   Panagakos present in court with Mr. Orian, and Mr. Werksman is
20   appearing by telephone.
21            THE COURT:  Okay.  Mr. Werksman, are you there?
22            MR. WERKSMAN:  I am.  Good afternoon, Your Honor.
23   Thank you for allowing me to appear telephonically.
24            THE COURT:  Yep, no problem.
25            MR. VIRTUE:  Thank you, Your Honor.  Cary Virtue on
```

1    behalf of Pranee Tubchumpol, who is present and in custody for

2    the hearing.

3              THE COURT:  Okay.  Let's take Mr. Orian first, okay,

4    and I guess I should look to Miss French.  It's her appeal.  I

5    did --

6         (Court and courtroom manager conferring.)

7              THE COURT:  Really?  Do you think we need one?

8              THE CLERK:  I don't know.  I just have it listed,

9    you know, when we print it.

10             THE COURT:  Let me check with counsel.  Does your --

11   does she need an interpreter?

12             MR. VIRTUE:  No.  We're okay for this hearing.  She

13   speaks great --

14             THE COURT:  Okay.  Thank you.

15             Okay.  So let me invite you to sit down for now, and

16   I will hear from Miss French.  It's the government's appeal

17   from Magistrate Judge Kurren's ruling.

18             Go ahead, Miss French.  I have read your papers.

19             MS. FRENCH:  All right.  Well, I mean I think the

20   principal legal issue, Your Honor, is that the government's

21   position is there is no new information that did not exist or

22   was not known to the movant at the time of the -- both the

23   first and the second detention hearings, the first one which

24   is -- you're aware was in Los Angeles soon after the defendant

25   was arrested.  It was a full bail hearing.

 1              The only new information that was brought to the --
 2    Judge Kobayashi's attention at the sort of review or
 3    revisitation of the detention matter was brought by the
 4    government, which was the existence of a third passport in the
 5    name that was Miss Tubchumpol -- I'm sorry.  We're on
 6    Mr. Orian.  I'm sorry.
 7              Excuse me.  It's nine o'clock East Coast time.
 8              THE COURT:  Okay.
 9              MS. FRENCH:  So let me go back to Mr. Orian.
10              The legal issue, nonetheless, is somewhat the same in
11    both occasions, which is that there is no information that
12    didn't exist or was known to the movant at the -- at the last
13    hearing.  In Mr. Orian's case the -- you know, as you know, the
14    matter was heard twice by Judge Kobayashi, who initially set
15    the $1 million bond secured by equity and property equity, and
16    there were extensive conditions.  And then because the
17    government believed that Mr. Orian was a flight risk, we
18    appealed it to the District Court, and you had two hearings,
19    and at the final hearing the bond was reduced to a quarter
20    million and the proposal of third-party custodian, which it
21    originally had been proposed and was actually approved by Judge
22    Kobayashi, was rejected in favor of the halfway house.
23              The only -- and I believe -- and I talked to both
24    Miss Cushman and Miss Small earlier today, and we don't have a
25    transcript.  And I believe that the -- from their recollections

1    that the matter of the proposed -- well, we certainly know at

2    several of the hearings, including the last hearing before you,

3    that the third-party custodian proposal was before the Court;

4    that initially the third party was proposed to be his wife in

5    Los Angeles, and that then subsequently there was, I think, at

6    least a discussion of the rabbi in California as well as

7    possibly him residing on the Big Island.  That came up at the

8    very initial hearing, with his wife possibly being a

9    third-party custodian.  And it was, you know, not accepted by

10   Judge Kobayashi or by District Court.

11           And so the halfway house was the sort of compromise

12   proposal, or at least what the court determined, and we think

13   at this point that is the appropriate detention, bail

14   determination.  And the only thing that's changed since the

15   last hearing, which was just a short time ago, is that

16   Mr. Orian has not moved to number 1 on the list.  He's moved

17   from 4 to 2, which as I understand how this matter progresses,

18   is not unusual.

19           And so you, as the trial judge, have already decided

20   this issue of what's an appropriate, you know, terms and

21   conditions of bail, and -- and then to have it appealed because

22   it wasn't moving fast enough or reconsidered by Judge Kurren

23   and also to have the bond reduced because, obviously, the

24   original representations in terms of assets were way overstated

25   and we're now down to 202,000, but, more importantly, the

1    third-party custodian, which is, you know, the basis why the

2    government has appealed.

3         I don't think that we believe that there's any

4    information that is new in the sense that it didn't exist and

5    was not known to the movant at the time of, certainly, the

6    hearing before your court on appeal, and the only thing that's

7    changed since the initial hearings were that Mr. Orian has less

8    assets than, you know, were initially represented.

9         We oppose the proposal and Judge Kurren's order that

10   the third-party custodian would be the rabbi.  We don't believe

11   that there's a sufficient relationship with the rabbi that

12   makes it an appropriate placement, and -- and those are, in

13   short, why we appealed this matter again to your court.

14        THE COURT:  Okay.  Miss Panagakos, did you want to

15   say anything?

16        MS. PANAGAKOS:  I believe Mr. Werksman will be

17   arguing by phone.

18        THE COURT:  Oh, okay.  Good ahead, Counsel.

19        MR. WERKSMAN:  Your Honor, unfortunately, Miss French

20   was not at the hearing on October 8 before Your Honor.  And

21   when the government alleges that there are no new facts or

22   circumstances presented but they don't have the benefit of a

23   transcript and weren't there, then they are prone to making the

24   mistakes that Miss French just made.

25        As Your Honor may recall, and as the transcript would

    1   certainly demonstrate because I was there, and I know Your

    2   Honor was there on October 8, there was no discussion of

    3   Mr. Orian being released to a third-party custodianship of his

    4   wife.  In fact, Pretrial Services had recommended that

    5   Mr. Orian be released to a third-party custodian named Lisa

    6   Machenberg, who is a close family friend and a therapist, who

    7   is a responsible member of the community.

    8           And the court and present counsel, we discussed the

    9   viability of yet another third-party custodian, who was,

   10   coincidentally, a deputy district attorney in Los Angeles and

   11   had volunteered to work in that capacity and had spoken to

   12   Mr. Barry of Pretrial Services about being a third-party

   13   custodian.  There was no discussion on October 8th of

   14   presenting a third-party custodian on the Island of O'ahu.

   15   Rabbi Itchel, who, I believe, is present in the courtroom --

   16           THE COURT:  He is.

   17           MR. WERKSMAN:  -- has written a letter.  There's a

   18   letter from Rabbi Itchel that we filed with our application for

   19   modification, which was granted by Judge Kurren and which is

   20   the subject of this appeal.  Rabbi Itchel, although he was

   21   present in court to show his support for Mr. Orian, a man he's

   22   known for six years, worked with for six years, with whom he

   23   has a deep abiding friendship and relationship, notwithstanding

   24   government's claim -- I don't know where they come up with the

   25   fact to state so blithely that there's an insufficient

1    relationship.  That's just wrong, Your Honor, and you can tell

2    by the letter written by Rabbi Itchel, and he's there in court

3    to answer any questions regarding his suitability as a

4    custodian.

5           But, Your Honor, we did not discuss a third-party

6    custodian in O'ahu.  In fact, Pretrial had recommended, and

7    Judge Kobayashi had ruled, that bail should be set and that

8    Mr. Orian should be returned home to live in his home with his

9    wife and three children in West Los Angeles, in Malibu.

10          And so when we left on October 8, the court had ruled

11   that, rather than a third-party custodianship in Malibu, that

12   Mr. Orian would be required to be released to the Mahoney Hale

13   facility.  At the time we all believed, and Mr. Barry

14   represented -- and to the best of his knowledge at the time on

15   October 8 -- that there were, I think, four people in a line,

16   and Mr. Orian was at the end of that line, and that release was

17   imminent.

18          In fact, Your Honor, at the time Miss Cushman, who

19   was representing the government and who is not in court today

20   but was there on the 8th, she went so far as to tell Your Honor

21   that the government would consider agreeing to release

22   Mr. Orian to his home in Malibu if after a satisfactory period

23   of release to the halfway house he would -- he would

24   demonstrate his suitability for supervision back home in Los

25   Angeles.  And that's why the court set a return date of

1    January 6, which was intended to be 90 days from October 8th,

2    whereupon we all expected Mr. Orian to -- by that point to have

3    been out for 60 to 90 days.

4           But here we are almost a month later, and Mr. Orian

5    is still way back in the line, and according to Mr. Barry's

6    best information from last week when we were in front of Judge

7    Kurren, he was still a month away from release.  This is

8    certainly new information.  If this isn't new, Your Honor, then

9    we need to redefine the word "new."

10          And Mr. Orian's inability to post a $250,000 bond,

11   that too is a new -- I just -- I don't know how the government

12   can argue this isn't new.  And I remind Your Honor, and

13   Pretrial reminded the court on October 27th, that the hearing

14   in front of Judge Kurren, that Your Honor had expressed some

15   concern to the prosecutors that, if Mr. Orian can't make his

16   bond of 250,000, that the court would entertain -- would

17   reconsider because the court said and the law provides that a

18   defendant shall not be detained merely because he can't afford

19   the bond.

20          In short, Your Honor, we have Judge Kobayashi, Judge

21   Kurren, and Pretrial Services consistently and relentlessly

22   recommending that Mr. Orian be released.  Judge Kurren's ruling

23   was spot on, Your Honor, and he analyzed the issues and he

24   reasoned that the release to the Chabad House as a home

25   confinement was an even more secure form of release than

1   Mahoney Hale.

2         And if the court recalls, and I put this in my brief,

3   Your Honor, the court anticipated that GPS monitoring at

4   Mahoney Hale where Mr. Orian would be free to leave during the

5   day, go to work, go to an office, the court's concern was that

6   he just stay on the island so as to avoid the potential for

7   flight.

8         By contrast now there is an even more restrictive

9   release being proposed, which is that he be at home confinement

10  at the Chabad facility, and pretrial goes so far as to carve

11  out an exception for riding the elevator because he's not

12  leaving the building.

13        So, in short, Your Honor, and in summary, I -- I

14  won't belabor the point, unless the court has specific

15  questions about my position.  We have a recommendation that's

16  sound, it's viable, it's supported by Pretrial Services.  It

17  provides a higher degree of restriction than Mahoney Hale.

18        But there's something in it for the defense, Your

19  Honor.  The court might wonder why do we want a more

20  restrictive confinement.  We don't.  Frankly, we'd like to see

21  his release to the Chabad, have some looser terms, but,

22  frankly, Your Honor, to not have to be in a facility filled

23  with drug addicts and convicted -- sentenced prisoners, to be

24  in a more humane, decent facility where he can practice his

25  religion, eat kosher food, and be amongst people that's like

1    family to him, Rabbi Itchel and his congregation.  That's of

2    tremendous value.  And he'll be -- he'll at least have an

3    opportunity during the day, during his confinement at the

4    Chabad to do some business over the telephone and in his -- in

5    his facility there, and he can meet with defense counsel and he

6    can begin preparing his defense.

7        And I'll submit, Your Honor, it's a reasonable and

8    appropriate recommendation and finding by Judge Kurren, and I

9    ask this court to ratify it, not overturn it, because of the

10   government's appeal.

11       THE COURT:  Okay.  Miss French, anything else?

12       MS. FRENCH:  I -- my understanding was at the last

13   hearing -- and, although I was not there, I -- as I said, I've

14   talked to Miss Cushman and Miss Small -- was that the court was

15   not comfortable releasing Mr. Orian to a third-party custodian

16   and thought that a setting where there were rules and

17   regulations that he would need to comply with would be an

18   appropriate first step.

19       And as I understand from my conversations with both

20   co-counsel, there was never a representation by Miss Cushman

21   that the government supported that the natural next step would

22   be that he would return to Los Angeles to his home or another

23   setting, but that we did not oppose a status conference on

24   January 6 to reassess the situation.

25       I -- the third-party custodian issue has been before

1    the -- before the various courts, and I don't think in terms of

2    the Bail Reform Act is the language that requires the parties,

3    either the government or the defense, to establish that there

4    is new information that did not exist previously has been

5    established by defense counsel.  This is not new information;

6    it's just that Mr. Orian doesn't want to wait any longer.  And

7    I don't think that that is a reason to have brought the matter

8    back before the court before Judge Kurren and, essentially, to

9    overrule what this court has already decided.

10          MR. WERKSMAN:  Your Honor, do I need to address the

11   obvious factual error she just made in her recitation of what

12   was discussed on October 8th?

13          THE COURT:  No, I don't think you need to do that.  I

14   have a pretty good recollection myself.  And when we were last

15   here discussing this matter, I said that I was concerned about

16   him going back to California, and I thought that there was less

17   risk of flight if he stayed in the District of Hawai'i.  But he

18   didn't have a residence here.  I know that they have some

19   property on a neighbor island, but we -- I wanted him to stay

20   where he could be monitored by a Pretrial Services officer, and

21   we don't have the same ability on a neighbor island.

22          So at the last hearing we did not discuss any kind of

23   an arrangement with an individual acting as a third-party

24   custodian here on the Island of O'ahu, and so I think that is

25   something new.  I understand that third-party custodians have

1   been discussed in prior hearings but not -- not this particular

2   third-party custodian with the agreement to do the electronic

3   monitoring on a long-term basis on the Island of O'ahu.  That

4   is something new, and I think that is an important

5   consideration for me, and I think that Judge Kurren was correct

6   in concluding that the new conditions would satisfactorily

7   address the risk of flight as well as any danger to the

8   community.

9           And so I am going to affirm Magistrate Judge Kurren's

10  amendments to the conditions of release so that they are

11  modified as he stated:  the amount of the bond is $202,000.

12  This will be secured by mortgages on property.

13          MR. WERKSMAN:  The property's posted, Your Honor.

14  It's the property belonging to his wife, the so-called Captain

15  Cook property.

16          THE COURT:  Okay.  And Mr. Orian will be placed in

17  the third-party custodianship of Rabbi Itchel Krasnjansky on

18  Atkinson Drive, and Mr. Orian is to live at that address and he

19  has to comply with the location monitoring program.

20          Now, he can leave the property for medical reasons,

21  court appearances, attorney visits, or other activities; so any

22  legal or medical appointments.

23          Now, as I understand it, there will be a work space

24  made available to him.  He has to have the radio frequency or

25  traditional electronic monitoring program requirements in

1   place, he has to follow the directives of the Homeland Security

2   investigations, and he has to still stay incarcerated until all

3   the electronic arrangements, such as telephone connections and

4   so forth, have been put in place.  But other than --

5           MR. WERKSMAN:  Your Honor, may I request that he also

6   be permitted to leave the facility with the advanced permission

7   of Pretrial for business purposes, if he has a designated

8   meeting scheduled with individuals that he needs to meet with

9   in order to conduct his business.  Would the court permit that

10  and put that in the directive so that there will be no

11  misunderstanding, if he needs to go to a certain location at a

12  certain time for a period of two or three hours to meet with

13  people in connection with his businesses?

14          MS. FRENCH:  Judge --

15          THE COURT:  I'm not going to give -- I'm not going to

16  give blanket -- I'm not going to give blanket approval to

17  leave.  Instead, he may leave for additional matters with the

18  prior approval of Pretrial Services; so he's going to have to

19  get case-by-case approval in advance.

20          MR. WERKSMAN:  Okay.  But would Your Honor

21  acknowledge at least -- for example, it's vague as to what

22  would be appropriate, and if the court would indicate for

23  legitimate business or personal reasons so that at least

24  Pretrial has some guidance that, if he has a business thing and

25  they view it as being reasonable and appropriate and it works,

1    that they would -- that that would be something the court would

2    contemplate.

3         MS. FRENCH:  Judge, this is an issue that was before

4    Judge Kurren, and the government strenuously objected.  And I

5    don't know if it's part of the terms and conditions of bail,

6    but the government would request that the defendant not be

7    allowed to engage in labor -- the labor contracting business.

8         Our evidence is that he has continued to be engaged

9    in labor contracting work, and there's actually a court order

10   from 2010 involving another similar scheme as to the one

11   charged involving workers from Nepal that he was sending to

12   Canada and taking their money and not producing the work for

13   them in Canada under the guest worker program.  So we're very

14   concerned about him leaving for these, like, sort of nebulous

15   business meetings that are being proposed by counsel.

16        THE COURT:  Okay.  I'm not -- I am going to leave it

17   at you can leave for other matters as pre-approved by Pretrial.

18        Mr. Werksman, actually Pretrial is, you know, is

19   pretty reasonable; so -- and I'm sure I'll hear if they, you

20   know -- if your client feels that there are legitimate requests

21   that are being refused, you can come back to me, but I think we

22   should start with having him have to get pre-approval from

23   Pretrial Services for anything other than the legal and medical

24   appointments.

25        MR. WERKSMAN:  Understood.

1           THE COURT:  Okay.  So --

2           MS. FRENCH:  And may I renew my request that there be

3   a condition of his bail that he not engage in the labor

4   contracting business.

5           MR. WERKSMAN:  Your Honor --

6           THE COURT:  I guess -- I guess I am not certain what

7   would fall under that, and so, you know, I am going to leave it

8   where he has to get pre-approval from Pretrial Services for

9   leaving the premises.  And, you know, if they have any concern

10  at all, they will bring it to me.  If I need to have a hearing,

11  I'll schedule one.  But I think we're going to get into a

12  dispute about each little activity, and I don't think that's

13  the purpose that this appeal hearing should serve.

14          MR. WERKSMAN:  Okay.  Well, thank you, Your Honor.

15          THE COURT:  Okay.  So --

16          MR. WERKSMAN:  Will the court acknowledge in the file

17  that we posted the property and that the release then would be

18  forthwith upon proof of the -- upon satisfaction of Pretrial

19  that the RF monitoring is set up?

20          THE COURT:  I don't think you need me to acknowledge

21  this.

22          MR. WERKSMAN:  Okay.

23          THE COURT:  I'm saying that when everything is set up

24  and all the conditions for release have been met, then he's

25  going to be released to the third-party custodian.  I've never

1   had a problem where Pretrial, you know, somehow held something

2   up or, you know, unfairly disputed whether property had been

3   posted.  You know, I'm going to leave it the way it is.

4   Magistrate Judge Kurren's ruling is affirmed.

5            MR. WERKSMAN:  Thank you, Your Honor.

6            THE COURT:  Okay.  Now we're going to turn to the

7   next defendant.

8            Mr. Virtue, let me hear first from the government on

9   its appeal; then I'll hear from you.

10           Okay.  Miss French.

11           MS. FRENCH:  Well, the basis of the appeal in the

12   matter with Pranee Tubchumpol is that again there is no new

13   information that didn't exist at the time of the first

14   detention hearing in Los Angeles, as I started to say earlier

15   when I talked about Mr. Orian.  The second detention hearing

16   that occurred before Judge Kobayashi, the only new evidence

17   that was presented at that time was from the government that

18   had learned between the two hearings that there was a third

19   passport, which I'm sure is in the pretrial report, which was

20   explained at the Judge Kurren hearing was the result of her

21   belief in numerology.

22           Regardless, the reason why she is not an appropriate

23   candidate is, number one, there isn't really a -- any

24   production of new information that was not readily known to her

25   and counsel at the first hearing, let alone the second hearing.

1    And, in fact, she was not even forthcoming about this third

2    passport at that hearing when her passports were to be

3    confiscated.

4            And -- but beyond that again her frequency of trial

5    travel, her foreign connections, her lack of personal

6    connections, and Judge Kobayashi indicated her concern that, if

7    there were any third-party custodian that were appropriate, it

8    should be somebody that had the type of connections that she

9    would think, like, quite a few times about whether to abscond.

10           The proposed third-party custodian presented to Judge

11   Kurren is an alleged boyfriend, who supposedly she has a close

12   relationship with for a year.  And the -- the facts also

13   presented are that, nonetheless, she's been living with her

14   ex-husband.  Her business is a massage parlor.  She has no

15   close personal, you know, family in the United States.  And for

16   those reasons the government believes that the prior two orders

17   to detain her should stand.

18           MR. VIRTUE:  Thank you, Your Honor.  Appreciate that.

19           Well, first off, I respect -- pardon me?

20           THE COURT:  Can you talk into a mike.  Thank you.

21           MR. VIRTUE:  Oh, sorry.  Thank you, Your Honor.

22           With all due respect I completely disagree with the

23   government's position.  I'd like to correct something because,

24   unfortunately, Pranee, who was arrested -- and I believe FBI

25   Agent Barry Wood was there --

1          MS. FRENCH:  I can't hear -- I can't hear --

2          THE COURT:  You might have to pull the mike way

3   closer.  Now just move the whole base closer.  Okay.

4          MR. VIRTUE:  Thank you, Your Honor.  I apologize.

5          You know, this is one of those cases where a client

6   is arrested in another jurisdiction, and it was on

7   September 2d, I believe.

8          THE COURT:  Can you hear, Miss French?

9          MS. FRENCH:  Yes, I can hear now.

10          THE COURT:  Okay.

11          MR. VIRTUE:  She was rushed to a detention hearing in

12   the Central District of California.  I called the Federal

13   Public Defender's office, and I spoke to the federal defender

14   who handled that hearing, and he indicated to me that they did

15   not have a full evidentiary hearing; that it was more like a

16   passing through to the District of Hawai'i.  That's where I

17   picked up this case as a C.J. panel member.

18          When I arrived and met Pranee, we were just getting

19   to know her circumstances and situation.  We arrived and asked

20   for a review, which is permitted under the Bail Reform Act, of

21   her detention status.  And a couple things came up.  One of

22   them, I simply did not know and had no information that there

23   was real property available to post as collateral on behalf of

24   Pranee Tubchumpol by her boyfriend.  The boyfriend was not

25   present at the hearing in front of Judge Kobayashi.  He called

1    me after.  That hearing I let him know, indeed, that she was

2    still detained, and I called him up, and he says, You know,

3    she's -- she has a wealth of friends in central California --

4              THE COURT:  Hold on.  Let me ask a favor of you.

5              MR. VIRTUE:  Yes.

6              THE COURT:  Especially because we have opposing

7    counsel on the phone, you always need to talk into a mike.

8    I've seen lots of attorneys do this.  You turn and you look at

9    your client, you turn and you look at your client, you say a

10   few words, you turn and you look at your client.  What's

11   happening is your voice is going in and out over the mike.  So

12   if you can --

13             MR. VIRTUE:  All right.

14             THE COURT:  -- just face the mike the whole time, it

15   will help.

16             MR. VIRTUE:  I will do that.  Thank you.  Appreciate

17   that.

18             So he simply hadn't thought of that and didn't know

19   he could use his house as collateral.

20             MS. FRENCH:  Judge, there's somebody talking on the

21   phone.

22             THE COURT:  Hold on.  Hold on.  Mr. Werksman, are you

23   still on the phone?

24             MR. WERKSMAN:  Hello?

25             THE COURT:  Hello.  Mr. Werksman, are you on the

1    phone?  Hello?

2              MR. WERKSMAN:  Hello?

3              THE COURT:  Hello.  Can you hear me?

4              MR. WERKSMAN:  Yeah, this is Mark Werksman, Judge.

5    I'm listening, but I've got the -- I muted the sound.

6              THE COURT:  Okay.  It kind of sounded like we were

7    hearing a side conversation of yours or -- is there background

8    noise or something, but it's making it hard for government

9    counsel, Miss French, who's also here by phone, to hear.

10             MR. WERKSMAN:  I apologize.  Perhaps if I just --

11             THE COURT:  I'm -- I'm --

12             MR. WERKSMAN:  Perhaps I'll just hang up, Your Honor.

13             THE COURT:  Yeah.  You know, I mean you're welcome to

14   stay, but --

15             MR. WERKSMAN:  It might have been unclear.

16             THE COURT:  Okay.

17             MR. WERKSMAN:  Thank you.

18             THE COURT:  Thank you.

19             Okay.  Miss French, I'm hoping this will help now.

20             Go ahead, Mr. Virtue.

21             MR. VIRTUE:  Thank you.  So I talked to Dave Rogers,

22   who's a decorated firefighter with the Los Angeles Fire

23   Department, and he's in a very serious relationship with my

24   client Pranee.  He said I'm flying out to Honolulu.  This

25   person is not a serious flight risk.  They don't understand.

1   This issue wasn't -- they don't know about it.  And he came

2   out, brought mortgage papers with him to post -- to ask that he

3   use his personal property.

4        And as I -- we discussed with Judge Kurren, there's

5   many of us who have friends we wouldn't do that for, but the

6   fact that he would actually put his property forward, fly, what

7   is it, three, 4,000 miles here in person to answer the judge's

8   questions speaks remark -- it speaks volumes of what this

9   person believes, you know, in the integrity of my client, who

10  is an American citizen, a naturalized American citizen.

11       And so he was here.  He originally was going to do

12  cash, but he has property to put up, which we can do under the

13  agreement to forfeit real property for bail.  And he came here

14  because the prosecutors were assuming that just because she has

15  a relationship with a firefighter that's a boyfriend status

16  that that is not a significant tie to our community.  And so he

17  flew out here to say, "That isn't correct.  It's significant,

18  and I'm here to vouch for Pranee Tubchumpol."

19       The second issue that came up was the issue, which

20  was unfortunate, but she -- and from originally the country

21  where she's from, Thailand, the issue in front of Judge

22  Kobayashi, my client had all her passports sent to me.  I

23  brought three -- I brought the three of them to court, gave

24  them to Pretrial Services, the FBI checked it out.

25  Everything's on the up and up.  But then the name change popped

1    up.

2            THE COURT:  I know.

3            MR. VIRTUE:  And it threw all of us off:  the court,

4    the prosecutor, defense.  I hadn't heard of something like that

5    before.  So Judge Kobayashi specifically said, Mr. Virtue, I

6    invite you to come back to the on-duty magistrate if you have

7    some new information about this and ask to readdress that.

8            And so in the meantime I called the Thai Consulate in

9    L.A.  I got ahold of a Thai monk.  We have a letter from a Thai

10   monk I presented to Judge Kurren.  We got letters from -- we

11   had Anna Largensuk (phonetic), who's a Thai -- a U.S. citizen

12   with Thai culture.  She came to court, and she was going to

13   bring a book.  I mean it's actually fascinating.  You can

14   change your name, and by increasing the letters in your name,

15   you increase your good luck number.  Well, that's what my

16   client did.  And it was an explanation to show why that someone

17   did something innocently, you know, it can, you know, got

18   perceived as being --

19           THE COURT:  Okay.  Don't keep turning away from the

20   mike.

21           MR. VIRTUE:  Right.  It got -- it opened the door for

22   the government to make this objection.

23           And so we're -- and we provided all of this

24   information all along to Pretrial Services, which twice in

25   front of Judge Kobayashi and again in front of Judge Kurren

1    recommended release.  And I had fortunately just gotten into a

2    CJA panel attorney, and one of the things Pretrial Services

3    passed out -- and I put it in my response that I filed

4    electronically Friday -- was she fits almost all nine

5    categories for release.  And so when you read the Bail Reform

6    Act, there's sort of like a presumption of release.

7            And I think, unfortunately, Your Honor,

8    unfortunately, what happened to someone who's never been

9    involved in the criminal justice system before is she got

10   tagged in L.A. in a rushed hearing without an appropriate

11   evidentiary hearing with the label "serious flight risk"

12   because she originally was from Thailand.  We all have

13   immigrant forebearers, you now.  And she came here.  She's an

14   American citizen.  Her parents are deceased.

15           And so the government's trying to hang its hat on,

16   well, she's got a brother and a sister over there, but they

17   have no other evidence other than assumption.  And I strongly

18   feel and suggest that we agreed to every single condition that

19   Pretrial Services has recommended to the court:  the GPS -- you

20   know, just because the government looks with disfavor that my

21   client is still residing in a house with her ex-husband, who's

22   70-something years old, and they were married for over

23   nine-and-a-half years but are now best friends, that might be

24   unusual to certain people, but in our culture where we have

25   multiple generational families in situations living under the

1    same roof in Hawai'i, it's not.

2         And that he -- that is about a third-party

3    custodianship that Pretrial Services has recommended, and he

4    has been in contact with Pretrial Services, and her ex-husband

5    calls me, like, every single day.  And so I would suggest, as I

6    did to Judge Kurren, that her home is here.  Yes, there is

7    always going to be some ties with Thailand, but that doesn't

8    mean she's a serious flight risk and needs to be permanently

9    detained.  And so I think Judge Kurren absolutely did the right

10   thing in looking at all the conditions imposed.

11        The Bail Reform Act specifically says that, you know,

12   that, you know, the conditions are there to reasonably assure

13   appearance, and the presumption is to go there.  And I would

14   you -- I would ask that Your Honor to please -- please uphold

15   Judge Kurren's findings.  She won't be released today because

16   there's still paperwork that needs to be done in terms of title

17   with the property with Dave Rogers that needs to be sent here,

18   and then the ex-husband needs to work with Pretrial Services to

19   make sure everything is in place with the phone and things like

20   that.  But I think that this is a candidate that ought to be

21   released.  Thank you.

22        THE COURT:  Okay.  Miss French, did you have anything

23   more?

24        Miss French, did we lose you?

25        Hello?

```
1              THE CLERK:  Shall I call her?

2              THE COURT:  Okay.  We're going to go off the record.

3         (Discussion off the record.)

4              THE COURT:  Okay.  We're here.  We're here.  Wait

5    now.  We're going to stay off the record for a minute just so I

6    can figure out, Miss French, when we lost you.

7              MS. FRENCH:  No.

8              THE COURT:  Okay.  Now is your chance.  Go ahead.

9    We're here.

10             MS. FRENCH:  Okay.  First, with respect to the first

11   bail hearing, I know Agent Brown is in the courtroom, and I

12   also spoke to the L.A. Assistant United States Attorney.  And I

13   was informed by both, and also I think the minutes of that

14   proceeding indicates, that was a full bail hearing.

15             Second, I agree that the defendant has a right for

16   the court, the court with original jurisdiction, to review the

17   determination of the Los Angeles United States Magistrate

18   Judge, and that was done by Judge Kobayashi, who found that her

19   frequent travel to Thailand, her lack of -- her connections in

20   Thailand, and her lack of substantive connections in the

21   country as well as the nature of the charges and so forth were

22   reasons to continue to detain Miss Tubchumpol.

23             The passport was not considered.  As I understand it,

24   it was not even known at the first hearing.  I understand that

25   Judge Kobayashi did not think a third-party custodian was
```

1   appropriate, unless the third-party custodian had the type of

2   relationship with Miss Tubchumpol that would make her think

3   quite seriously about absconding.  And I just find it rather

4   curious that counsel argues that she has this close serious

5   relationship with Mr. Rogers, who I, you know, mean no

6   disrespect to, while she continues to live with her ex-husband.

7   It doesn't seem like the type of close relationship that would

8   make her -- because the question is really whether she's a

9   flight risk, not whether Mr. Rogers thinks that she is going to

10  not abscond.  The question is whether she would abscond.  And

11  it doesn't appear, if she continues to reside with her

12  ex-husband and not reside with the, quote, boyfriend, that that

13  is the type of relationship that she would give that kind of

14  thought to before she would leave the country.

15         I also think that, you know, the nature of her -- of

16  her business.  She runs a massage parlor.  And I'm not

17  suggesting that there's a trafficking, you know, aspect, but

18  that's her business is to run a massage parlor.  And when you

19  put all of that together, I don't think that the defense has

20  sufficiently neither produced new evidence or overcome the

21  evidence that suggests that she's a flight risk -- convincingly

22  that she's a flight risk and that she should continue to be

23  detained.

24         Two courts before Judge Kurren looked at this, and,

25  you know, I just think that from the government's point of view

1    this is not the kind of information that is new.  And even if

2    it were new, this is not an appropriate third-party custodian

3    that would guarantee reasonably that she would, you know, make

4    her court appearances and not be a flight risk.

5          THE COURT:  Okay.  I don't know if, Mr. Virtue, you

6    have anything more to say about the relationship.

7          It is a little unusual to live with an ex-husband.

8          MR. VIRTUE:  I would like to address that.  It's

9    because it takes a while for relationships to get to a point

10   where you move in and get married, but it's not unusual for

11   someone who's your best friend and may have been married to you

12   to say, you know, "Times are economically tough.  You still

13   have a place to live here.  I care for you as a friend."  And

14   that's what Al Molinar does.  He cares for his ex-wife as if --

15   I mean there's probably almost a 30-year difference between

16   them, and it's almost -- you know, there's more there

17   psychologically in that relationship.  That's not unusual.

18         And I'm kind of a little bit -- I don't know, I mean

19   she has a legitimate business, and to imply that she does not I

20   find offensive because she has -- it's called Five Senses Thai

21   Massage.

22         THE COURT:  I'm sorry.

23         MR. VIRTUE:  She has a legitimate business, and I

24   find it a little offensive for the government to be insinuating

25   that somehow that because she has a Thai massage business,

1    which is legit, on internet, helps people with back problems,

2    is somehow not legitimate.  I mean that's --

3              THE COURT:  Okay.

4              MR. VIRTUE:  -- the point is she has employment.

5              THE COURT:  Can I --

6              MR. VIRTUE:  But the relationship is -- I think

7    that's -- I realize that that's -- for some -- actually, I

8    don't -- I don't really find that particularly any -- I just

9    think that, given the situation of this family, that that --

10   it's not unusual that an older man, who for different reasons

11   they decide not to be married anymore, would still provide a

12   place, her own space, room, bedroom in a house to stay with and

13   is willing to comply with all the conditions of Pretrial

14   Services.  What business is that of the government that she

15   stays there instead of, you know, forcing her to move in with

16   the firefighter, who they may not be ready to go make that kind

17   of commitment yet.

18             THE COURT:  How long has she --

19             MS. FRENCH:  May I suggest that we inquire what year

20   the divorce was obtained and what year she obtained her

21   citizenship?

22             MR. VIRTUE:  Well, it's all been verified by the FBI

23   that she's been -- got a proper naturalized citizenship.  I

24   have -- that was in 19 -- that was in -- we presented this to

25   Pretrial, sorry, Services.

1          MS. FRENCH:  I understand.  But I'm in the state of

2    Florida, not in my office with a file.  It's, like, ten o'clock

3    at night, okay?

4          MR. VIRTUE:  She has a naturalized citizenship of

5    February 3d, 2006, from U.S. District Court, Central District

6    of Los Angeles, California.

7          MS. FRENCH:  Right.  And what month and year was she

8    divorced?

9          MR. VIRTUE:  Does the court wish to hear the answer

10   to that, Your Honor?

11         THE COURT:  Well, when -- wait.  When did she get

12   divorced?

13         MR. VIRTUE:  In 2008.

14         THE COURT:  2008.  And when -- and how long have she

15   and Mr. Rogers had a close relationship?

16         MR. VIRTUE:  I believe a little over a year.

17         He's actually a hero.  He's a decorated firefighter

18   in the Los Angeles Fire Department, awarded the --

19         MS. FRENCH:  I would suggest -- suggest the issue is

20   not with whether Mr. Rogers is a good man.  The question is

21   whether she's a flight risk.

22         MR. VIRTUE:  Well, the government just speculates and

23   makes assumptions, Your Honor.  They haven't produced anything.

24   She -- the bail statute presupposes some kind of release with

25   conditions.

1          THE COURT:  Right.

2          Okay.  You know, this is a case where detention is

3    not a presumption the way it is in some other kinds of cases.

4    And in this case, you know, since the time that Judge Kobayashi

5    ordered detention there has been an explanation of what

6    appeared to be use of different names.  There has also been

7    this offer, which I don't think was before Judge Kobayashi, of

8    a mortgage by Mr. Rogers.  Those things are significant and

9    they're new.  And, you know, certainly Mr. Rogers thinks that

10   his relationship with this defendant is close enough for him to

11   post a mortgage on his property.

12         But most of all I'm focusing on the fact that this is

13   not a case in which there's a presumption of detention; so I

14   have to examine whether there are conditions that can, you

15   know, meet any flight risk or any risk of danger to the

16   community.  And it seems to me that at this point the

17   defendants have met, you know, all that they need to show, and

18   there's no presumption of detention; so, you know, I have to

19   start there.

20         So I'm going to affirm the order of release entered

21   by Judge Kurren on the conditions that he set forth and

22   delaying release until such time as the conditions that have to

23   be met before release have indeed been satisfied; so the bond

24   has to be executed, the security has to be provided, passport

25   surrendered, and the documents and the arrangements for

 1     third-party custodianship have to be in place, and then she can

 2     be released.  Okay?

 3               MR. VIRTUE:  And I already turned in the passports

 4     right after --

 5               THE COURT:  Okay.

 6               MR. VIRTUE:  -- our last hearing, Your Honor.

 7               THE COURT:  Okay.  I think that's it, then, and we'll

 8     talk again with the next proceeding.

 9               MR. VIRTUE:  Thank you.

10               MS. FRENCH:  Thank you.

11               THE COURT:  Does pretrial need anything more from me?

12               PRETRIAL SERVICES OFFICER:  No, Your Honor.

13               THE COURT:  Okay.  Thank you.

14          (Court recessed at 3:50 P.M.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2          I, Debra Kekuna Chun, Official Court Reporter, United

 3  States District Court, District of Hawaii, do hereby certify

 4  that the foregoing is a true, complete, and correct transcript

 5  from the record of proceedings in the above-entitled matter.

 6          DATED at Honolulu, Hawaii, May 6, 2011.

 7

 8                                      /s/ Debra Chun
                                        _____
 9                                      DEBRA KEKUNA CHUN

10                                      RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```