1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF HAWAII
2

UNITED STATES OF AMERICA,      )    Case No.  CR10-00576SOM
3                              )
                  Plaintiff,   )    Honolulu, Hawaii
4                              )
          v.                   )    October 27, 2010
5                              )    2:05 p.m.
MORDECHAI YOSEF ORIAN, aka     )
6  MOTTY, PRANEE TUBCHOMPOL aka )
SOM,                           )
7                              )
                  Defendants.  )
8  _____ )


9     TRANSCRIPT OF DEFENDANT MURDOCH EX PARTE APPLICATION TO MODIFY
        BAIL CONDITIONS; DEFENDANT TUBCHOMPOL MOTION FOR REVIEW OF
10                          DETENTION ORDER
              BEFORE THE HONORABLE BARRY M. KURREN
11                UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19  Transcriber:              Jessica B. Cahill
                              P.O. Box 1652
20                            Wailuku, Maui, Hawaii 96793
                              Telephone: (808)244-0776
21

22

23  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.

24

```
 1  | APPEARANCES:
    |
 2  | FOR PLAINTIFF:              U.S. DEPARTMENT OF JUSTICE
    |                            By:  SUSAN FRENCH, ESQ.
 3  |                            601 D Street, N.W.
    |                            Washington, D.C. 20004
 4  |
    |                            U.S. ATTORNEY'S OFFICE
 5  |                            BY:  SUSAN CUSHMAN, ESQ.
    |                            300 Ala Moana Boulevard, #6100
 6  |                            Honolulu, Hawaii 96813
    |
 7  | FOR DEFENDANT              LYNN PANAGAKOS, ESQ.
    | MORDECHAI ORIAN:          For: MICHAEL JAY GREEN, ESQ.
 8  |                            841 Bishop Street, Suite 2201
    |                            Honolulu, Hawaii 96813
 9  |
    |                            LAW OFFICES OF MARK J. WERKSMAN
10  |                            By:  MARK WERKSMAN, ESQ.
    |                            888 West Sixth Street, 4th Floor
11  |                            Los Angeles, California 90071
    |
12  | FOR DEFENDANT              CARY VIRTUE, ESQ.
    | PRANEE TUBCHOMPOL:         1931 E. Vineyard Street, #201
13  |                            Wailuku, Maui, Hawaii 96793
    |
14  |
    |
15  |
    |
16  |
    |
17  |
    |
18  |
    |
19  |
    |
20  |
    |
21  |
    |
22  |
    |
23  |
    |
24  |
    |
25  |
```

```
 1   OCTOBER 27, 2010                            2:05 P.M.

 2             THE CLERK:  Criminal number 10-576SOM, United States

 3   of America versus defendant (01) Mordechai Yosef Orian,

 4   defendant (02) Pranee Tubchompol.  This case has been called for

 5   hearing on a motion for review of detention order as to

 6   defendant (02), and an ex parte application to modify bail

 7   conditions as to defendant (01).  Please make your appearances.

 8             MS. FRENCH:  Susan French, Department of Justice and

 9   Susan Cushman with the United States Attorney's Office.

10             MR. WERKSMAN:  Good afternoon, Your Honor, Mark

11   Werksman appearing on behalf of Mordechai Orian who is present

12   in custody and with me in court is local counsel Lynn Panagakos.

13             THE COURT:  Okay.  I'd like to actually have you over

14   by the microphones, please.

15             MR. WERKSMAN:  Thank you.

16             THE COURT:  Thank you.

17             MR. VIRTUE:  I'll go to the microphone.

18             THE COURT:  Please.

19             MR. VIRTUE:  Do you want our clients over there too?

20             THE COURT:  No, they'll stay there.

21             MR. VIRTUE:  Thank you, Your Honor, Cary Virtue on

22   behalf of Pranee Tubchompol who's present in court, in custody

23   on our motion to revisit the detention order.

24             THE COURT:  Yes.  Good afternoon.

25             MR. VIRTUE:  Thank you, Your Honor.
```

1          THE COURT:  Okay.  So let's take up defendant Orian

2    first.  I reviewed the report and the paperwork.  Anything you

3    want to address or point out on this matter?

4          MR. WERKSMAN:  I do, Your Honor, and I want to request

5    that the Court give some careful thought to the terms and

6    conditions of Mr. Orian's release, assuming that the Court

7    agrees to accept the bond of $202,000, and then the only issue

8    then is where will he be released to.

9          I would like to renew my request that Mr. Orian be

10   released to his home in Los Angeles, California under Global

11   Positioning Satellite supervision, on the GPS monitoring.  That

12   is something that originally Judge Kobayashi thought would be

13   appropriate when she ruled on September 7th, that bond was

14   appropriate and should be set, and that he should be released on

15   GPS to his home in Los Angeles, California.

16         The following day, we had additional hearings because

17   of the existence of an ICE detainer, which is now not an issue,

18   but she reiterated that -- that ruling.  And at the time, Your

19   Honor, Pretrial Services had recommended that Mr. Orian be

20   released to his home.

21         He has a family, three young children, a business,

22   extensive ties to the West Los Angeles community, which have

23   been well documented by dozens of letters of support that have

24   been filed with the Court and is a part of the record that the

25   Court's already heard.  I won't -- I won't belabor it if the

1    Court's aware of that.

2          That would be our preference, Your Honor.  My client

3    has now been in custody for two months notwithstanding the fact

4    that Pretrial has recommended had recommended his release, Judge

5    Kobayashi ordered his release, and Judge Mollway ordered a

6    release, but he's still in custody.

7          He's in custody at this stage, (a) because we couldn't

8    come up with the entire amount of the bond, which we -- we -- we

9    rectified if the Court would lower the bond.  We've already

10   posted the $202,000 property.  So we're more than 80 percent

11   towards the $250,000.

12         The other issue is where he's going to be released,

13   Your Honor.  Judge Mollway had a vision that because of her

14   concerns that he might leave the jurisdiction that he be --

15   remain on Oahu.  And so, she determined that he should go to the

16   Mahoney Hale facility.  Three weeks later he's no closer to

17   getting into that facility than he was then.  He's a little

18   closer, but Pretrial acknowledges they only have eight male beds

19   that they can use.  A month ago he was number four in line, now

20   he's number two in line.  There's no hope in sight.

21         But I would point out, Your Honor, that originally

22   when Judge Mollway ordered his release to Mahoney Hale her plan

23   was that he be restricted to Oahu, be placed on GPS monitoring,

24   and that he be free to go to work, be able to have somewhat of a

25   life, but on Oahu.

1          Now, Your Honor, we have a recommendation that he be

2    released to the third party custodianship of Rabbi Itchel, who

3    is present in Court.  He's the gentleman in light blue shirt

4    there.  He's -- he's here.  He wrote a letter, which Your Honor

5    has, and Pretrial has interviewed him and gone to his facility.

6          The Pretrial recommendation is a blessing and a curse.

7    It's a blessing in that it does recommend he be released to

8    third party custodianship, but it now adds a condition that he

9    be restricted to home incarceration within the Chabad facility.

10   So now, Your Honor, he's imprisoned in the Chabad facility.

11         May I request, Your Honor, that the Court consider

12   reducing the bond to $202,000, which is ample reason, and the

13   law would support it, and everybody agrees with that on -- on

14   this side.  I -- I know there's going to be some opposition on

15   this side, but I know that everybody on the bench so far has

16   agreed with that.

17         And also, Your Honor, let him go home -- if that -- to

18   his life, his family, his work, and his counsel where we have a

19   huge job ahead.  Your Honor, I've been on this case now for two

20   months.  My representation of this man has been consumed by just

21   getting him bail.  We still have 15,000 pages of discovery to

22   digest, a massive case to prepare for, and to have him limited

23   to Oahu or to the Chabad facility would essentially deprive him

24   of his Sixth Amendment right to effective representation,

25   because he will not be able to cooperate with his chosen

1   counsel.  This case is paper driven.  It involves dozens and

2   dozens of witnesses, many of whom don't speak English.  I need

3   my client in my office, in Los Angeles to help me prepare this

4   case.

5            So I'm begging you, Your Honor, to allow him to go

6   home to Los Angeles with a GPS.  His passport's already been

7   posted with the Clerk.  There's no where this guy can go.  He

8   can't run and hide from this case, and he wouldn't.  He has no

9   history of failures to appear anywhere, even in traffic court.

10  There isn't a single failure to appear.  He's never been held in

11  contempt by any court in which he's litigated.  He has no prior

12  criminal record.  His children are U.S. citizens.  He's tethered

13  to this community in Los Angeles in more ways than imaginable.

14           If that is not acceptable to Your Honor, then I would

15  ask that the Court allow him to be -- to get out of FDC, go to

16  the Chabad facility on a GPS, but be limited to the Island Oahu

17  so the man can, in his own words, he -- he begged me to say, he

18  said tell the judge I need some fresh air.  I want to see the

19  sunshine.  Two months after he's been arrested he still hasn't

20  been able to see the sunshine although everybody's agreed so far

21  that he ought to be released.

22           So would you allow him -- if you won't let him go

23  home, which is where he really belongs, would you allow him to

24  go to the Chabad but be able to at least leave the facility to

25  work, attend meetings, help me interview witnesses.  We have

1    such a big job ahead, Your Honor, that we can't do it if he's in

2    prison, either FDC, or Mahoney Hale, or the Chabad.

3            So I would respectfully request that the Court

4    consider that.  And if the Court has any other specific concerns

5    or issues I'd be happy to address those, but that's what I

6    principally wanted to report to Your Honor.

7            THE COURT:  So Mahoney Hale came up when the case went

8    up on appeal or -- or was that -- was that recommended at -- at

9    -- at the initial bail --

10           MR. WERKSMAN:  It was never recommended, Your Honor.

11           THE COURT:  I mean not so much recommended, but I mean

12   ordered.

13           MR. WERKSMAN:  No, nobody recommended it.  What

14   happened, Your Honor, is at the fourth day of hearing on October

15   8, Judge Mollway agreed to set a $250,000 bond, release him on

16   GPS, and then at the very end in response to concerns that if he

17   went anywhere but Oahu, there was a greater chance he might not

18   stay.  She said well let's -- let's keep him in Oahu and because

19   there was no obvious place to put him, she basically accepted

20   the Government's recommendation that he be put in a halfway

21   house.

22           So the halfway house was a recommendation of the

23   Government and the Judge thought at the time, and Pretrial does

24   a good job, I think, of explaining the Judge's thinking.  She

25   was thinking, look, where am I going to put this guy.  I want

```
 1   him to stay on the island, because it's easier to make sure he's
 2   here.  I understand that.  I disagree, but I understand that.
 3            So she chose this halfway method, which turns out to
 4   be unworkable, because three weeks later, and we can't get a bed
 5   for the guy.  So he's --
 6            THE COURT:  Right.
 7            MR. WERKSMAN:  -- and there's no hope in sight.
 8            THE COURT:  Okay.  Thank you.
 9            MR. WERKSMAN:  Thank you, Your Honor.
10            THE COURT:  Ms. French.
11            MS. FRENCH:  Well, Judge, you've come into this matter
12   quite belatedly because there's been numerous hearings and
13   there's a very long history, factually and procedurally, as
14   you've already heard and can tell from the pretrial report.
15            This began with Judge Kobayashi who actually ordered
16   $1 million secured by property bond.  Only because the
17   defendant's financial situation and his property was in such a
18   state of disaster did it ultimately get reduced to a quarter of
19   a million when it was on -- when it was -- the matter was
20   appealed to Judge Mollway.  And there's been -- so there's been
21   extensive testimony, and proceedings, and there's -- there's
22   nothing new that really requires it to come before this Court.
23            I mean I think it's pretty clear that for it to be
24   reviewed before this Court there should be some new circumstance
25   or something that was not known to the defendant or, you now,
```

1    some knew set of facts that would dictate that it should come

2    before the Court.

3         There's a great concern and, of course, as I know

4    you're aware the Government asked that the defendant be

5    detained; concern about the nature of the case, the severity of

6    the -- the offenses, the -- the flight risk.  There is an ICE

7    detainer on the defendant.  If he is removed from a structured

8    environment there's a good chance that ICE would take him in

9    custody.

10        You may or may not know that he's under an order of

11   deportation back to Israel, and he's appealed his deportation

12   which is to say if he were placed in ICE custody he could, in

13   fact, withdraw his appeal and be on a plane back to Israel.  So

14   I think it's a very real concern, and its part of the

15   consideration for why Judge Mollway wanted to have him in a

16   structured environment if he was going to be released in here

17   where he could be under close supervision.

18        The -- the Rabbi, I don't believe there's a long

19   history between the defendant and the Rabbi.  This was brought

20   up at earlier hearings.  I -- I believe, and correct me if I'm

21   wrong, Mr. Werksman, that he may have been present at the very

22   first hearing.  He was certainly present at the hearing before

23   Judge Mollway.

24        So we've had two other judges who have considered the

25   facts, and the arguments of counsel, Government, defense

1    attorney in detail and this is the most recent fashioned remedy.

2            I don't think that he should be given any preferential

3    treatment.  He shouldn't be treated differently than any of the

4    other defendants that come before this Court.  All of the

5    defendants want to be out, and they all want to see the light of

6    day --

7            THE COURT:  Well, you know, look, but it's not

8    uncommon, because we do have serious problems with Mahoney Hale

9    for the issue to be, you know, taken a look at if we can't, you

10   know, get, you know, some action on getting a defendant into the

11   halfway house.  Whether it's determined that they, you know, can

12   be in a less -- well, it's determined they don't necessarily

13   need to be in custody.

14           So -- so I mean this --

15           MS. FRENCH:  Well, he's moving up the list.  He's now

16   to number two.

17           THE COURT:  Right.

18           MS. FRENCH:  He's number two on the list.  So he's

19   gone from four to two.  And --

20           THE COURT:  It's been some time.  It's been, what, a

21   couple months.

22           MS. FRENCH:  It's been two months.  It's been two

23   months.  Pretrial said it would probably be another month.

24           The -- you know, it's -- every time there's an

25   impediment the bond gets reduced or there's another condition

1  that is, you know, weighed in consideration of the defendant.

2  And every defendant, of course, wants to be out.  Every

3  defendant wants to be able to have easy access to counsel, and

4  -- and, you know, this -- the courts have come down with the

5  bond from a million to a quarter of a million, and Mr. Werksman

6  asked if the Government would agree to the -- waive the

7  difference between 202 and 250, and that they would ask at least

8  for another 30 days that the additional condition be lifted up

9  having him in Mahoney Hale, and we basically objected and said

10  let's see what the situation is, you know, with him getting into

11  the halfway house, and then if the only impediment is $20,000

12  we're open to talking about it.

13        So I think it's still in the same posture.  The facts

14  haven't changed.  There is nothing new other than the fact that

15  he's moving up on the list just like any other defendant that

16  comes before the Court, and I think that Judge Mollway's order

17  should stand and that, you know, if -- if the Court wants to

18  review it in 30 days and see where he is on the list in 30 days,

19  if he's not already in the halfway house it can be revisited.

20        MS. CUSHMAN:  Could I just add one other thing,

21  because I actually argued the matter in front of Judge Mollway?

22  And I know when we were discussing him going into the halfway

23  house there was also some further discussion that if he did well

24  at the halfway house, and there weren't any violations, that we

25  would -- the Government would perhaps entertain a motion to

1    modify his release conditions at that point, after he had been

2    in the halfway house to see how it was going.

3              So I don't think that just because he goes to the

4    halfway that means he's going to be in the halfway house from

5    that point on until the case goes to trial.

6              THE COURT:  But it was not contemplated that, you

7    know, there would be this inaction for --

8              MS. CUSHMAN:  No, we knew -- everybody knows that

9    there's a delay when you go to Mahoney Hale.  That's sort of

10   standard.  You know, and -- and Judge Mollway, I know, selected

11   Mahoney Hale because there were some concerns about his

12   background, and she considered him a flight risk as has the

13   other judges.

14             THE COURT:  Okay.  Anything else you want to say about

15   -- about any issues?

16             MS. FRENCH:  No.

17             THE COURT:  Any response?

18             MR. WERKSMAN:  Your Honor, just -- just briefly.  Your

19   Honor, the Government has already conceded that they would

20   seriously consider agreeing he can go home to Los Angeles after,

21   I think, they said 60 or 90 days, at the most, after his

22   placement in the halfway house.

23             So their opposition sounds, and don't take this the

24   wrong way, opportunistic.  They're opposing his release now

25   because I've asked for it, but in fact they wouldn't mind

1  releasing him maybe 30 days from now.  The only thing is, Judge,

2  the next 30 days he might still be at FDC.  It's already been

3  agreed that the man deserves a fair pretrial release.  It's not

4  a presumption case.

5          And I will add one thing, Your Honor, I know the

6  prosecution seems almost resentful that he would seek to assert

7  his constitutional right to a reasonable bond, but it's the

8  prosecutors who waited until ten days before the expiration of

9  the statute of limitations to bring this case.

10         Does Your Honor know that these charges date back to

11  2004 and 2005 and that they didn't bring the indictment until

12  ten days before the statute of limitations expired?  And then

13  they brought it on the Wednesday before Labor Day, they told him

14  on Thursday, and he was here to self surrender on Friday.  This

15  man has done nothing but show his good faith, his good will, his

16  willingness to participate in this litigation.

17         I have been here five times as his counsel from Los

18  Angeles, and I've got one of the finest law firms in Oahu

19  assisting me on this case.  This man is committed to these

20  proceedings.

21         So, Your Honor, the choice today is do you just make

22  him sit around FDC for a few more weeks, and then jam him into

23  Mahoney Hale as long as we can get him in there and keep him

24  there until the Government finally says, okay, now it's time for

25  him to go home.  Just let him go home now, Your Honor.  The guy

1   has already been in custody two months in a case where there's

2   no presumption and everybody's agreed he should be released.

3          THE COURT:  Okay.  Okay.  Thank you.

4          MS. FRENCH:  Just very briefly.  I mean that is not

5   the Government's position.  We think he should be detained and

6   the only reason that this came up as a sort of compromise for

7   the Court was when it became apparent he was going to get

8   released.  And there was concern all the way around for the

9   Government and the judges that he maybe couldn't follow the

10  rules, that he cannot follow the rules.

11         And so, just saying that it's perfectly all right, and

12  we're going to agree in 30 days for him to go home, I think it's

13  really important to see if he can follow, like, the rules.  And

14  that's why it's an appropriate setting, and that's the position.

15         THE COURT:  Well, Mahoney Hale is not a perfect

16  facility in -- in many ways actually.  You know, I -- I've,

17  unfortunately, been dragged into this, you know -- you know,

18  late -- late in the game, but I -- but I have spent some time,

19  you know, looking through the papers here and, you know, having

20  heard both of you, and reviewed the case pretty closely.

21         I certainly feel that Mr. Orian is -- is a candidate

22  for release under certain circumstances.  And, you know, it may

23  well be that at some point in time it would be appropriate for

24  him to return to his home.  I'm not prepared to go that far at

25  this time.

1          So then the question is do we stay with Mahoney Hale,

2    when there isn't bed space available and there hasn't been for

3    some -- some period of time, or is there some alternative that

4    -- that makes sense, and it would not be the case if I were to

5    agree to this that he's getting some preferential treatment.  We

6    do this all the time, because we do have difficulties with

7    limited space available at Mahoney Hale.

8          You know, I've looked at the circumstances surrounding

9    a third party custodian who certainly appears to me to be an

10   appropriate and willing individual to assist the Court.  I look

11   at the conditions that are -- that are being proposed here.

12   I've taken into account, of course, that this is not a

13   presumption case, and I think frankly that with the

14   recommendation of Pretrial Services and the conditions that are

15   recommended, this -- this appropriately and adequately addresses

16   the flight risk issue.

17         So I'm going to go along with what Pretrial Services

18   has recommended.  I think -- I think this is an entirely

19   reasonable alternative, and I'm sure the Court will take a good

20   hard look at this, you know, down the road if everything works

21   well.  You know, with this arrangement the Court can closely

22   monitor the case, I think, and supervise this defendant, you

23   know, in connection with this location.

24         You know, quite frankly, I think in many ways this

25   might even be better than Mahoney Hale.  There are a lot of

```
 1   issues and problems with Mahoney Hale.  I've -- I've -- I have
 2   close and a longstanding, you know, understanding of what goes
 3   on at Mahoney Hale, what the problems have been there.  It is
 4   not like a substitute for custody, and what we -- if someone
 5   needs some structure, but is appropriate for release, and -- and
 6   they don't have some alternative or some appropriate structure
 7   on the outside that is when we look at Mahoney Hale, but where
 8   we have some facility, or some location, and some appropriate
 9   third party custodian in the community that can provide some
10   level of assistance and supervision, along with what the Court
11   can provide, you know, that's better than Mahoney Hale.
12           So this, in my view, is better than Mahoney Hale, I
13   think, and I think frankly can give us, you know, some
14   additional assurance and security, you know, above and beyond
15   what Mahoney Hale would be able to do.  So that's why I'm -- I'm
16   -- I think this is an appropriate alternative.
17           MS. FRENCH:  And the Court is aware that the ICE
18   detainer will kick in, and they will take him in custody?
19           THE COURT:  Well, I'm -- it's represented here it will
20   not.
21           MS. FRENCH:  I -- I don't understand who --
22           THE COURT:  Well, it's in the report, I believe.
23           MS. FRENCH:  That -- that's not my understanding of
24   how the ICE detainers work, but --
25           THE COURT:  Mr. Barry, what -- what do you know about
```

```
 1   this?

 2          MR. BARRY:  Just what was in the report from the

 3   attorney.  I haven't checked --

 4          THE COURT:  Oh, so you haven't actually talked with

 5   them?

 6          MR. BARRY:  Not recently with ICE.  No, Your Honor.

 7          THE COURT:  Oh.

 8          MR. BARRY:  I mean if he does go into ICE custody, and

 9   they don't act, then he'll just be released.

10          THE COURT:  Okay.  Well, what do you know about that?

11          MR. WERKSMAN:  His immigration lawyer has been told by

12   ICE that they're willing to abide by the terms and conditions

13   set by the Court.  They do have 48 hours to seek to detain him

14   once he is set for release.

15          THE COURT:  Okay.

16          MR. WERKSMAN:  It's up to them.  I'm told they're not

17   going to, but either way, Your Honor, he'll be subject to this

18   Court's jurisdiction and that's -- so be it.

19          THE COURT:  Okay.  Well, you know, it is what it is.

20   Okay.  I mean, you know, it's -- it's -- if that's what they do,

21   that's what they do.

22          MR. WERKSMAN:  Your Honor, would the Court consider

23   allowing him to be on GPS as opposed to the home incarceration?

24          THE COURT:  No, I'm going to go this step now.

25          MR. WERKSMAN:  Okay.
```

1          THE COURT:  Okay.  And -- and -- one step at a time,

2     but this -- this is what I would be prepared to do at this

3     point.

4          MR. WERKSMAN:  And, Your Honor, I -- I'm not haggling

5     with the Court, but would the Court -- the Court has some

6     discretion with regards to specific terms.  Would the Court

7     allow Pretrial discretion to allow Mr. Orian to attend specific

8     meetings with clients or with business partners outside of the

9     facility with, say, 24 hours notice, so that at least he could

10    call up Pretrial and say, I've got to meet some people at this

11    location from 2:00 to 4:00 p.m., and they would have that

12    authority?

13         THE COURT:  Okay.  No, I'll -- I'll allow them to do

14    that.

15         MR. WERKSMAN:  All right.  So for legitimate business

16    related purposes --

17         THE COURT:  Right.

18         MR. WERKSMAN:  -- he could have permission to leave

19    the facility upon reporting his itinerary, so to speak --

20         THE COURT:  Yeah, he -- he has to get the advance --

21    advance approval --

22         MR. WERKSMAN:  Yes.

23         THE COURT:  -- of Pretrial Services.

24         MR. WERKSMAN:  Yes.  Plus all legal visits he can go

25    to -- legal visits within the Island of Oahu.

```
 1              THE COURT:  Right.

 2              MR. WERKSMAN:  Could -- could he have legal visits in

 3    Los Angeles?

 4              THE COURT:  No.

 5              MR. WERKSMAN:  No.  Okay.  But he could go to Mr.

 6    Green's office and Ms. Panagakos --

 7              THE COURT:  Don't -- don't push me.  Don't push me.

 8    You're -- you're putting me right up to the edge here, so I

 9    would say --

10              MR. WERKSMAN:  Understood.

11              THE COURT:  -- my advice to you is back off.

12              MR. WERKSMAN:  Yes, sir.

13              THE COURT:  Okay.  That's enough.

14              MS. FRENCH:  Will Pretrial have knowledge of where

15    these --

16              THE COURT:  Yes.

17              MS. FRENCH:  -- out of location meetings are, because

18    it's our understanding that the businesses have pretty much been

19    shut down that he's operating.

20              THE COURT:  No, this is going to be here, and they're

21    going to -- they're going to get an itinerary, and have specific

22    information, and be able to monitor it in -- in appropriate way.

23    Okay.  Okay.  So -- and I don't have a problem with the bail

24    amount reduction.

25              MR. WERKSMAN:  Would the Court acknowledge then that
```

 1 | he is prepared for forthwith release, because the bail's been
 2 | posted, the 202,000?
 3 |         THE COURT:  Okay.  Well, they -- they make take an
 4 | appeal.  So, you know, if there's an appeal, there's an appeal.
 5 | So you've got to wait that out.  Okay.  You want to do that?
 6 |         MS. FRENCH:  Can we -- can you give us -- just give us
 7 | a little bit, and I'll -- we'll let you know?  I'm -- I'm
 8 | leaving on Friday.  I mean Friday is my last day.
 9 |         THE COURT:  Okay.  Could you let me know how about by
10 | the end of the day?
11 |         MS. FRENCH:  Sure.
12 |         MS. CUSHMAN:  Yes.
13 |         THE COURT:  Sure.  Okay.
14 |         MS. FRENCH:  Okay.
15 |         MR. WERKSMAN:  Subject to any further Government --
16 |         THE COURT:  Right.
17 |         MR. WERKSMAN:  -- intervention.
18 |         THE COURT:  So here's -- here's the deal.  If they
19 | want to take an appeal, the stay will remain in place until the
20 | appeal runs its course.  If they say this afternoon not -- not
21 | -- you know, they'll go with this, then he can be released
22 | forthwith.
23 |         MR. WERKSMAN:  Very well --
24 |         THE COURT:  Okay.
25 |         MR. WERKSMAN:  -- as long as the order reflects a

```
 1   forthwith release based upon the posting of the bond.

 2               THE COURT:  Right.  Right.

 3               MR. WERKSMAN:   Very well.  Thank you, Your Honor.

 4               THE COURT:  Okay.  So -- so the conditions that are

 5   going to be changed here, we're going to add the -- the bond

 6   amount is going 202,000 secured by a security mortgage on the

 7   properties owned by the defendant and/or his wife with

 8   sufficient equity to fully secure the bond.

 9               I will permit the defendant to be placed in the third

10   party custodianship of -- of the Rabbi and with the location and

11   address as -- as indicated by Pretrial Services.  And, generally

12   speaking, it will be under a home incarceration restriction, but

13   I'm going to permit him to -- to attend, and in fact Pretrial

14   Services is actually recommending this, verified legal and/or

15   medical appointments.  They've got to be provided some advance

16   notice, and an itinerary, and the defendant has to get approval

17   of Pretrial Services, but -- but that's already recommended

18   here.

19               MR. WERKSMAN:  That's legal and medical, but there's

20   also business, Your Honor, business related meetings.  That's

21   what we're requesting.  In other words, not necessarily going to

22   his lawyers office, but he may have to meet with people in

23   connection with his -- his company.  In other words, not

24   strictly legal and medical, but with the -- with the discretion

25   of Pretrial and with preapproval to attend meetings.
```

```
 1              THE COURT:  What about that?
 2              MS. FRENCH:  Well, I don't know what -- I would like
 3   to know what company and the nature of these business meetings.
 4              THE COURT:  Okay.  You know, I'm going to say right
 5   now legal.  I'm going to stick with anything associated with the
 6   case.  Okay, and then we'll see where we go.
 7              MR. WERKSMAN:  Very well.
 8              THE COURT:  Let's do -- let's do this one step at a
 9   time.
10              MR. WERKSMAN:  Thank you.
11              THE COURT:  Okay.  Okay.  Electronic monitoring will
12   be in place.  He's to comply with the directives of -- of HSI,
13   Homeland Security Investigations.
14              The release is delayed -- what's the status on the
15   telephone line?
16              MS. FRENCH:  What?  I'm sorry?
17              THE COURT:  Has it been installed?
18              MR. BARRY:  Yes, tomorrow.
19              MR. WERKSMAN:  It's supposed to be in tomorrow.
20              THE COURT:  Oh, okay.  So it's getting delayed until
21   they're -- until that's in place tomorrow.
22              MR. WERKSMAN:  All right.  Very well.
23              THE COURT:  Okay.  So we'll know today, and then if
24   everything works out, it's installed tomorrow, he can be
25   released tomorrow.
```

1              Okay.  So we'll delete the Mahoney Hale issue, the GPS

2    monitoring, and all of the other provisions that Pretrial

3    Services has indicated.  Okay.  Mr. Orian, do you understand

4    these changes?

5              MR. ORIAN:  Yes.

6              THE COURT:  Okay.  Read the bail papers over

7    carefully.  If you have any questions about anything make sure

8    they're answered before you sign off.  Okay.

9              MS. FRENCH:  We'll let the Court know by close of

10   business today.

11             THE COURT:  Thank you.  Okay.  Terrific.

12             MR. WERKSMAN:  Thank you for your patience.

13             THE COURT:  Okay.  Thank you.

14             MR. WERKSMAN:  Thank you.

15             THE COURT:  Okay.  So let's go on to -- I'm sorry how

16   do you pronounce it?

17             MR. VIRTUE:  I'm learning myself.  It's Pranee

18   Tubchompol; is that right?

19             THE COURT:  Tubchompol.  I'm sorry.  Okay.  Thank you.

20             MR. VIRTUE:  Thank you, Your Honor.

21             THE COURT:  Yes.

22             MR. VIRTUE:  Thank you for letting us set this

23   hearing.

24             THE COURT:  Yes.

25             MR. VIRTUE:  Judge Kobayashi invited us to come back

1  if we had some new conditions under the Bail Reform Act.

2           THE COURT:  Okay.

3           MR. VIRTUE:  So we do.  Today, we have Dave Rogers.

4  Dave, will you stand up please?  He's a decorated firefighter

5  for the Los Angeles Fire Department with over 23 years of --

6  he's a veteran with the Government in Los Angeles, and he is a

7  long time -- he is the boyfriend of Pranee, and he cares very

8  much for her.

9           And I'm submitting to the Court that there are

10 conditions that will assure Pranee's return to Court as she's a

11 naturalized American citizen.  We went through all the checks at

12 our last court date.  There's no ICE detainers or anything like

13 that.  We have the passports -- the three passports are right

14 here ready to be turned in to the District Court Clerk.  Dave is

15 prepared to sign off on the agreement to forfeit real property.

16          I thank Pretrial Services for again taking another

17 look at this case and, for a second time, they're in agreement

18 with the defense.  We provided them with as much information as

19 I could, in advance of the hearing, and they're recommending the

20 release.  I -- I agree to all the conditions in the report and

21 so does Pranee.  And she has a business, the Five Senses Thai

22 Massage in -- in Los Angeles.  She has nothing to do with any

23 H2A Program ever again.

24          And she has -- there's a whole lot of letters that

25 I've received, that I've -- I've notified Pretrial Services

1    about, but one of the most recent ones I got, after I file my

2    motion, Anna Larkson (phonetic), who was going to try and be

3    here, there she is right there, and she brought with her -- one

4    of the issues that came up at our last hearing on the motion to

5    detain was the use of, on her Thai passport when she renewed it,

6    she changed her name.

7              THE COURT:  Right.  Right.

8              MR. VIRTUE:  And that caught me off guard, it caught

9    the Court off guard, it caught the Prosecutor off guard.  The

10   reason she changed her name, and I didn't know this, is that in

11   the Thai culture, you know, when you want to try and get better

12   luck, and Pranee is very much into numerology, and she consults

13   with a Buddhist monk, and it was recommended she change her

14   name.

15             And so, she changed her name and the letters

16   correspond to -- there's even different colors of the day, I've

17   learned from this, and -- and Anna can speak to that if the

18   Court wishes to hear that.

19             I also received a letter from a Thai Buddhist monk

20   verifying that this is not an uncommon practice in Thai culture

21   for folks to change their name.  Be that as it may, it's been

22   absolutely a stunning development for Pranee that this was a

23   snafu -- one of the snafus in her situation.

24             So I present this, and I can hand up this -- a copy of

25   the letter from the Buddhist monk or Anna can testify.  She

1    brought a book with her, I believe, that talks about all the

2    different names that -- how you can change, and it even

3    corresponds to -- oh, she forgot the book, but it exists.  And,

4    you know, it was quite an education for me talking to her

5    actually.

6            You know, Pranee is not only an American citizen, Your

7    Honor, I mean she's a hard worker.  This is an American

8    immigrant dream come true.  I mean she -- you know, her -- she

9    has more ties in the United States and California than she has

10   left in Thailand.  She came back to this country, and I'm

11   repeating myself from the last hearing, but she came back to

12   this country knowing she was under investigation.  She's not the

13   -- she's not the number one defendant in this -- in this case.

14   She was an employee and there are a lot of things that are going

15   to come out as the case progresses.

16           So, excuse me, so if the Court has any questions --

17           THE COURT:  Has the Government seen the letter you're

18   talking about?

19           MR. VIRTUE:  No, I just got it.

20           THE COURT:  Okay.

21           MR. VIRTUE:  I'll give a copy to her right now.

22           THE COURT:  Why don't you show it to them, because I

23   don't think we need testimony unless you want to talk --

24           MS. FRENCH:  Ms. -- Ms. Cushman is the one that --

25           MR. VIRTUE:  Excuse me about that.

1          MS. FRENCH:  I understand she's an expert in

2    numerology or whatever.

3          THE COURT:  Who, Ms. Cushman?

4          MS. FRENCH:  Yes.

5          THE COURT:  Why am I not surprised?

6          MR. VIRTUE:  Exactly.  But she's not a flight risk.

7    She's not a serious flight risk.  The presumption of the Bail

8    Reform Act is -- is, you know, release.  It's not a presumption

9    case, and I think that we've done our best to answer the Court's

10   concerns, and we're asking that she be released so she can go

11   back to L.A.

12         Her ex-husband, Al Molinar, has been in contact with

13   the Pretrial Services.  They were there together for over nine

14   and a half years.  She still resides there.  They're best

15   friends.  You know, he's -- he's like 70-years-old, the ex-

16   husband, but he cares for her.

17         And so, she has a verified place to stay.  They'll do

18   the GPS, the phone monitoring, and he'll send the paperwork back

19   to Pretrial Services.  So we thank the Court for hearing that.

20   If you have any questions I'll try my best to answer them, but

21   this is a case where she should be released, and I'm asking

22   again for that permission.

23         THE COURT:  Okay.  Thank you.

24         MR. VIRTUE:  Thank you.

25         THE COURT:  Ms. Cushman.

```
 1              MS. CUSHMAN:  Your Honor, this is the third hearing on

 2   her detention.  First, there was one in California, and she was

 3   detained, then Judge Kobayashi detained her, and now we're here

 4   again.  And, again, I would submit that there still really isn't

 5   a change in circumstances.  I mean Dave Rogers existed all this

 6   time, and now he's finally just agreeing to post the bond.

 7              You know, she has traveled extensively to Thailand.

 8   Her immediate family is in Thailand.  She really has no family

 9   connection to, you know, even California.  I mean even though

10   it's her boyfriend it's -- I don't think it's the same as having

11   a family connection or having a family member post bond.

12              So I still believe that she's a flight risk.  I think

13   the facts show that given her travel, given the use of two

14   passports.  I think the numerology thing is kind of cute and

15   kind of interesting, but it still is, you know -- you know, if

16   she decided to flee and use the other passport no one would have

17   known about it.

18              So I -- I just -- I don't -- I don't see a change in

19   circumstances.  I -- I think that she's, you know, a flight

20   risk, and I just don't see -- you know, I don't see the -- the

21   -- the boyfriend has having -- that's -- I don't -- I don't see

22   that relationship as being sufficiently close that, you know, if

23   she were to flee and leave him with this money that it's going

24   to really make him hurt.  I mean she still resides with her ex-

25   husband or up until this point she was residing with her ex
```

 1  -husband not the boyfriend.

 2          And even Judge Kobayashi had said that, you know, when

 3  somebody's posting bond like this she wants it to be a

 4  sufficiently close relationship so that that person -- that --

 5  that the defendant would feel guilty that that person would be,

 6  you know, absconding on the bond, and I -- I don't see that

 7  here.

 8          MR. VIRTUE:  May I briefly respond, Your Honor?

 9          THE COURT:  Okay.  Can I take a look at the letter

10  too, by the way?

11          MS. CUSHMAN:  Sure.

12          THE COURT:  Okay.

13          MR. VIRTUE:  Thank you, Your Honor.  I think what

14  we're hearing is speculation and assumption on the part of the

15  Government.  I haven't heard any real facts that she's a flight

16  risk other than she had a second passport, and she's from

17  Thailand.

18          THE COURT:  So what's different here today, then, you

19  know, the --

20          MR. VIRTUE:  Well, what I didn't realize when we had

21  our first hearing is that Dave actually has his own property

22  that's not encumbered with anyone's liens -- with any other co-

23  owners.  And so, he can post property that he owns in L.A. to

24  assure Pranee's appearance.  And that's provided -- we have that

25  unsecured bond agreement, which he's prepared to sign today and

1  -- and post with the Court.  And that is -- that is different.

2           Before we were talking cash, but he's going to put his

3  house on the table.  And I -- you know, think about -- just

4  because we're in court doesn't mean we park our common sense

5  outside.  I mean if you're a friend, and you're willing to put

6  your house on the line for another friend, even if it's a

7  girlfriend, that speaks volume.  I mean we certainly all have

8  relationships where we would never post a house or put 25,000

9  cash up for somebody who's just a friend.  This is someone that

10 he truly believes is going to come to court.

11          And as far as ties, her parents are deceased.  Her --

12 her -- her family is now America.  She became a citizen, in

13 what, 2007, I believe.

14          THE COURT:  I'm sorry, what does Molinar do?

15          MR. VIRTUE:  He's retired now, and he -- I'm sorry,

16 Pranee, what does Al do?

17          MS. TUBCHUMPOL:  (Inaudible).

18          MR. VIRTUE:  Yeah, he -- he's lived in -- in that

19 residence for many, many years.  He has his children that live

20 there.  Pranee has her own bedroom and space to live in that --

21 that residence, and she has a business right there and not too

22 far away which she started and runs.  It has nothing to do with

23 any kind of allegations with this case.

24          So there's lots of ties, you know, for her to come

25 back and forth, which her -- which the family will help her get

 1  back and forth with providing for the monies for her to fly back

 2  and forth.  I've talked to Mr. Molinar about that, and Mr.

 3  Rogers, and Pranee, and -- and other family -- family friends

 4  that are very much supportive of Pranee.

 5          I mean she doesn't even have -- I mean the -- when you

 6  sign off on a bond condition that says any conditions, there is

 7  probably -- there's two pages worth of conditions on the

 8  Pretrial Services sheet, which she's going to sign off on, you

 9  know including reporting, no contact.  We're doing the GPS.  I

10  mean that's -- that is significant conditions to assure a

11  person's return to court.  And -- and I think that -- I don't

12  know what else we can do to -- to show assurance that she's not

13  a serious flight risk.  I mean think about it?

14          I was just at a Pretrial Services information meeting

15  today with the CJA Panel and there's a whole checklist that they

16  provided the CJA attorneys.  I find it very interesting.  She

17  meets every checklist of why she should be released.  She has

18  other -- she has no prior misdemeanor arrests, she has no felony

19  arrests, she has no failures to appear, she -- she's employed.

20  She has -- as a matter of fact she runs her own business.

21          You know, she has resident status with the ex-husband.

22  I know that's unusual, but it happens in our day and age with

23  all the multi-generation families that live right here in Oahu

24  and Maui.  You know, family helps family even if you're the ex-

25  husband or the boyfriend, the firefighter.  And then there's no

1  substantive issues whatsoever, no drugs or alcohol, which is a

2  high risk for not coming back to Court.

3          And so, we're just left with the charges which are

4  serious and granted -- but the -- but the caselaw says you can't

5  hold the charges in itself --

6          THE COURT:  Well, it's the foreign ties.  You know,

7  that -- that issue.

8          MR. VIRTUE:  Well, she came from -- all of us come

9  back from -- from different countries, and we go back.  You

10 know, I have a grandfather that came from abroad.  Should I be

11 penalized for that?  You know, I mean, I don't think so.  She

12 cam here on her own and did everything possible to become an

13 American citizen.  So -- and also came back knowing that this

14 case was pending and under investigation.  That speaks highly.

15         THE COURT:  Okay.  You know, no case is without, you

16 know, risk.  I think a preponderance of the evidence indicates

17 to me that we can meet the flight risk issue with these

18 conditions.

19         MR. VIRTUE:  Thank you.

20         THE COURT:  So -- and you make some very good points.

21 So I -- I am going to go along with the recommendation of

22 Pretrial Services in this matter.

23         So these are the conditions, and I will put the

24 defendant in the third party custodianship of Mr. Molinar, and

25 she is to -- restricted to maintain that residence with Mr.

1    Molinar.  All of these -- all of the paperwork for him can be

2    provided either by mail or fax and returned to the Clerk's

3    office prior to release.

4            The bond amount will be $250,000 secured by a $20,000

5    security mortgage on Mr. Rogers' property in Long Beach, as

6    indicated.  And this must be posted prior to release.

7            Pretrial Services supervision, and you are prohibited

8    from participating in the U.S. Department of Labor H2A guest

9    worker program and/or other similar employment, labor programs

10   involving former foreign laborers.

11           These passports have to be surrendered prior to

12   release.  Travel is restricted to the Central District of

13   California and the Island of Oahu for court related purposes.

14           Contact is prohibited directly, indirectly, or through

15   third parties with any co-defendants, co-conspirators, victims,

16   or witnesses in this or any related case and the U.S. Attorney's

17   office will provide the names of any individuals with whom

18   contact is specifically prohibited.

19           There will be a home detention restriction with

20   Location Monitoring.  Which means that you are restricted to

21   your residence at all times except for employment, education,

22   religious services, medical, substance abuse, or mental health

23   treatment, attorney visits, court appearances, court appointed

24   obligations, and/or other activities preapproved by Pretrial

25   Services.  Is there something you wanted to address before I

1   finish this?

2           MS. CUSHMAN:  Yes, I -- I -- well, I just wanted the

3   Court to add an additional condition.  That she -- I don't know

4   how you want to fashion this, but she not seek any additional

5   passports under some new numerology name or something like that.

6           THE COURT:  Oh, absolutely.

7           MS. CUSHMAN:  Okay.

8           THE COURT:  In fact, I usually say, and I -- I

9   neglected to say it here on the passport.  So you are to

10  surrender the passports, you're not to seek any replacement

11  passport or other passport while this case is pending.  Thank

12  you.

13          MR. VIRTUE:  Now, if could make just one minor

14  suggestion?  My offices are in Wailuku, Maui.  I think we can do

15  all our meetings right here on Oahu, because it would be around

16  the court time, but if -- if per chance I need her to come to

17  Wailuku is that permitted with notification of Pretrial

18  Services?

19          THE COURT:  Yes.  Yes.

20          MR. VIRTUE:  For legal visit; right?

21          THE COURT:  Right.

22          MR. VIRTUE:  Nothing else.

23          THE COURT:  Yes.

24          MR. VIRTUE:  No business, nothing.

25          THE COURT:  Yes.  No, that's fine.

 1                MR. VIRTUE:  Okay.  Thank you.

 2                THE COURT:  You must abide by the program

 3     requirements.  And so, when I said Oahu I will expand that to

 4     also include Maui for specifically only for any legal meetings

 5     with counsel, but, again, Pretrial Services has to have advance

 6     notice of this --

 7                MR. VIRTUE:  Right.

 8                THE COURT:  -- and approve it.  So it would be Passive

 9     Global Positioning Satellite monitoring.

10                You're not to own, possess, or control any firearm or

11     ammunition.  If you have any of these items they are to be

12     surrendered to an agent approved by Pretrial Services.

13                You are to contribute toward the cost of services

14     required by this bond to the extent you are financially able to

15     do so, as determined by Pretrial Services.

16                Pretrial Services may request financial information

17     regarding your financial status.  Any information they request

18     you are to provide them with that information and sign any

19     appropriate release forms.

20                Also, they may run credit reports on a random and as

21     needed basis during the course of supervision to ensure

22     compliance and any authorization or release forms that Pretrial

23     Services may require you are to provide them with that as well.

24                Release will be delayed until the cash is posted,

25     passports are surrendered, and the third party custodianship

 1    documents are completed.

 2              And travel arrangements for your return to California

 3    must be approved in advance by Pretrial Services before release.

 4    Travel must occur on the weekday to facilitate installation of

 5    the Location Monitoring equipment.

 6              You're not to commit any offense in violation of any

 7    law and to appear in Court as required.  So, ma'am, do you

 8    understand these conditions?

 9              MS. TUBCHUMPOL:  Yes.

10              THE COURT:  Okay.  Please read the bail papers over

11    very carefully.  If you have any questions about any of the

12    conditions, and in addition to these conditions of release, the

13    papers will also specify all of the various penalties for any

14    violation of the release order.  So make sure you understand

15    exactly, you know, what you are dealing with here.  And if you

16    have any questions at all make sure that your questions are

17    answered before you sign off on the bail papers, because I will

18    assume, when you've signed off, that you -- you understand and

19    have agreed to all of the conditions, and fully understand the

20    applicable penalties.  Okay.

21              MS. TUBCHUMPOL:  Yes, Your Honor.

22              THE COURT:  Okay.  Thank you very much.

23              MS. CUSHMAN:  Your Honor, we'll let the Court know by

24    end of the day if we want to appeal this.

25              THE COURT:  Yes, very well.

1              MS. CUSHMAN:  Okay.

2              THE COURT:  Because we have to do some things anyway,

3    so --

4              MS. CUSHMAN:  Yes, thank you.

5              THE COURT:  -- just let us know.

6              MR. VIRTUE:  Thank you very much, Your Honor.

7              THE COURT:  Okay.  So anything else we should take up

8    in this case?

9              MS. CUSHMAN:  No.

10             (At which time the above-entitled proceedings were

11   concluded 2:47 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                              CERTIFICATE

4          I, court approved transcriber, certify that the

5  foregoing is a correct transcript from the official electronic

6  sound recording of the proceedings in the above-entitled matter.

7          Dated this 16th day of May, 2011.

8

9                              /s/ Jessica B. Cahill

10                         Jessica B. Cahill

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25